# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 26, 2021          Decided June 3, 2022

No. 19-7098

MARY E. CHAMBERS,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

———

On Rehearing En Banc

———

*Brian Wolfman* argued the cause for appellant. With him on the briefs were *David A. Branch* and *Madeline Meth*.

*Anna M. Baldwin*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States in support of appellant. With her on the brief were *Kristen Clarke*, Assistant Attorney General, *Bonnie I. Robin-Vergeer*, Attorney, *Jennifer S. Goldstein*, Associate General Counsel, Equal Employment Opportunity Commission, and *Sydney A.R. Foster*, Assistant General Counsel.

*Stephen B. Pershing* and *Carolyn L. Wheeler* were on the brief for *amicus curiae* Metropolitan Washington Employment Lawyers Association in support of appellant.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Dayna J. Zolle* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellant.

*Caroline S. Van Zile*, Principal Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, at the time the brief was filed, *Holly M. Johnson*, Senior Assistant Attorney General, and *Megan D. Browder*, Assistant Attorney General.

*Zachary C. Schauf*, appointed by the court, argued the cause and filed the brief as *amicus curiae.*

Before: SRINIVASAN, *Chief Judge*, HENDERSON, ROGERS, TATEL[*], MILLETT, PILLARD, WILKINS, KATSAS, RAO, WALKER, and JACKSON[**], *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL and *Senior Circuit Judge* GINSBURG.

Opinion concurring in the judgment in part and dissenting in part by *Circuit Judge* WALKER.

Dissenting opinion by *Circuit Judge* KATSAS, with whom *Circuit Judges* HENDERSON and RAO join.

TATEL, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*: In 1999, our court ruled in *Brown v. Brody* that the

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

[**] Judge Jackson did not participate in this matter.

denial or forced acceptance of a job transfer is actionable under Title VII of the Civil Rights Act of 1964 only if the employee suffered "objectively tangible harm." 199 F.3d 446, 457. Because this rule is inconsistent with Title VII and because intervening Supreme Court authority has eroded its reasoning, we now overrule it. We hold that an employer that transfers an employee or denies an employee's transfer request because of the employee's race, color, religion, sex, or national origin violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment.

**I**

Mary Chambers worked in the District of Columbia's Office of the Attorney General for more than twenty years before this litigation, first as a clerk and later as a Support Enforcement Specialist and investigator. Complaining of a larger caseload than that of her colleagues, she sought numerous transfers to different units in the Office. After these requests were denied, she filed a charge of sex discrimination with the Equal Employment Opportunity Commission, contending that similarly situated male employees had been granted transfers they requested. She filed this Title VII suit against the District in 2014 alleging unlawful sex discrimination and retaliation.

The district court, applying *Brown*, granted summary judgment to the District. The court concluded that Chambers had proffered no evidence that the denial of her transfer requests, even if motivated by discriminatory animus, caused her "'objectively tangible harm.'" *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 93 (D.D.C. 2019) (quoting *Brown*, 199 F.3d at 457). Noting we were bound by *Brown*, a panel of this court affirmed for the same reason. *Chambers v. District of Columbia*, 988 F.3d 497, 501 (2021). The members

of the panel—the authors of this opinion—wrote separately, however, to echo concerns voiced in prior opinions that *Brown*'s limitation on claims for discriminatory lateral transfers contravenes Title VII, which makes no reference to "objectively tangible harm" or any similar requirement. *Id.* at 503–04; *see Ortiz-Diaz v. U.S. Department of Housing & Urban Development*, 867 F.3d 70, 80–81 (D.C. Cir. 2017) (Rogers, J., concurring); *id.* at 81 (Kavanaugh, J., concurring). The panel members urged "that the full court hear this case *en banc* to correct this clear legal error." *Chambers*, 988 F.3d at 506. Heeding that call, the full court granted rehearing en banc to reconsider *Brown*'s rule that the denial or forced acceptance of a job transfer is actionable under Title VII, 42 U.S.C. § 2000e-2(a)(1), only if the employee suffered "'objectively tangible harm.'" *Chambers v. District of Columbia*, No. 19-7098, 2021 WL 1784792 (May 5, 2021) (quoting *Brown*, 199 F.3d at 457).

On rehearing, Chambers contends that *Brown* is facially inconsistent with Title VII. In her view, discrimination "connotes any differential treatment," and Title VII prohibits all workplace discrimination based upon a protected characteristic. Appellant's Br. 16. The United States filed an amicus brief in support of Chambers. The District also agrees that Title VII has no requirement of "objectively tangible harm" and that discriminatory transfers violate Title VII, but nonetheless urges us to stop short of accepting Chambers's broad formulation, lest the courts be deluged by challenges to "de minimis or harmless" workplace decisions. Appellee's Br. 10. With the parties in agreement that *Brown* should be overruled, we appointed Zachary C. Schauf as amicus curiae to defend the rule in *Brown*. He has ably done so, and the court thanks him for his assistance.

5

## II

The parties agree that Chambers's claim is covered by the antidiscrimination provision of Title VII, section 703(a)(1), which makes it "an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Chambers claims her employer denied her repeated requests for a transfer to a different unit while granting similar requests to male employees. Therefore, the question before us, put in terms of the relevant statutory text, is whether an employer that denies an employee's request for a job transfer because of her sex (or another protected characteristic) "discriminate[s] against" the employee with respect to the "terms, conditions, or privileges of employment." As we show below, the answer provided by the straightforward meaning of the statute is an emphatic yes, and that answer is fully consistent with Supreme Court precedent.

## A

We begin by parsing the statute, giving undefined terms their "ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The relevant part of section 703(a)(1) is capacious: By leaving undefined the phrase "terms, conditions, or privileges of employment," the Congress "evince[ed] a[n] . . . intent to strike at the entire spectrum of disparate treatment . . . in employment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (internal quotation marks omitted). Although the phrase is not without limits— not everything that happens at the workplace affects an employee's "terms, conditions, or privileges of

employment"—the transfer of an employee to a new role, unit, or location (as opposed to the mere formality of a change in title that Judge Walker instances in his separate opinion) undoubtedly is included.  Indeed, as the Government aptly says, "it is difficult to imagine a more fundamental term or condition of employment than the position itself."  Br. for Resp't in Opp. at 13, *Forgus v. Shanahan*, 141 S. Ct. 234 (2020) (No. 18-942), 2019 WL 2006239, at *13 (cleaned up).

The meaning of the term "discriminate" is also straightforward.  "Discrimination" refers to "differential treatment."  *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 174 (2005).  The unadorned wording of the statute admits of no distinction between "economic" and "non-economic" discrimination or "tangible" and "intangible" discrimination.  *See Meritor*, 477 U.S. at 64.  Nor does the statute distinguish between "subtle" or "overt" discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).  Rather, Title VII prohibits all discrimination with respect to terms and conditions of employment.

The statute speaks of "discriminat[ing] against" an employee because of a protected characteristic.  "No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 59 (2006); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020) ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated.").  Refusing an employee's request for a transfer while granting a similar request to a similarly situated employee is to treat the one employee worse than the other.  Like "refus[ing] to hire" or "discharg[ing]" an employee, refusing a request for a transfer deprives the employee of a job opportunity.  An employer that does this

because of the employee's "race, color, religion, sex, or national origin" has surely discriminated against the first employee because of a protected characteristic.

Once it has been established that an employer has discriminated against an employee with respect to that employee's "terms, conditions, or privileges of employment" because of a protected characteristic, the analysis is complete. The plain text of Title VII requires no more. Any additional requirement, such as *Brown*'s demand for "objectively tangible harm," is a judicial gloss that lacks any textual support. Applying the statute as written to discriminatory job transfers does not, as the dissent claims, create an "artificial distinction between transfers and everything else." Dissenting Op. at 29. To the contrary, it treats discriminatory transfers the same as any other discrimination with respect to the "terms, conditions, or privileges of employment."

Our amicus tries to avoid this straightforward conclusion by invoking the canon of *ejusdem generis* to argue that section 703(a) is limited to employment actions that are cognizable under the rule set forth in *Brown*. In *Babb v. Wilkie*, the Supreme Court applied this canon to conclude that the similarly worded statutory prohibition against age discrimination did not "encompass things that occur before a final decision is made." 140 S. Ct. 1168, 1176 n.4 (2020). That lends no support to the amicus's completely different application of the canon. However much the general term embraces, it surely includes refusing a job transfer request, the functional equivalent of "refus[ing] to hire" an employee for a particular position.

One last point: Our amicus and the dissent argue that for a claim to be cognizable under section 703(a)(1), the plaintiff must allege more than de minimis harm because the principle *de minimis non curat lex*—the law is not concerned with

trifles—is assumed to be incorporated in every statute, absent an indication to the contrary, *see Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). Whatever the merits of this argument, *Brown* excludes far more than de minimis harms. We have, for example, held that "public humiliation or loss of reputation"—injuries that have traditionally supported tort liability at common law, *see Memphis Community School District v. Stachura*, 477 U.S. 299, 306–07 (1986)—fail to satisfy *Brown*'s requirement of an "objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002). In any event, we need not decide today whether Title VII includes a de minimis exception because the discriminatory denial of a job transfer request, which deprives an employee of an employment opportunity offered to a similarly situated colleague, easily surmounts this bar.

## B

### 1

*Brown* made no attempt to ground the requirement of an "objectively tangible harm" in the statute. Instead, it based that requirement upon "the clear trend of authority" in the decisions of other circuits and upon the Supreme Court's then-recent decision in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), which it viewed as having "reinforced" the requirement. 199 F.3d at 455–57 (internal quotation marks omitted). For the reasons mentioned above, we are convinced that *Brown*'s approach is clearly mistaken, and that conviction is not overcome by any "trend of authority," let alone one marred by inconsistency, *see* below, section III.

Whatever reinforcement *Ellerth* furnished when *Brown* was decided has since been undermined by the Supreme Court's decision in *White*. In *Ellerth*, the Court relied upon

principles of agency law to hold that an employer has no affirmative defense to vicarious liability under Title VII for a hostile work environment when harassment by a supervisor "culminates in a tangible employment action." 524 U.S. at 765. The *Brown* court apparently perceived in that conclusion an implicit endorsement of a "tangible harm" requirement in Title VII claims involving direct liability. *See* 199 F.3d at 456.

The Supreme Court put that notion to rest in *White*, however, when it explained that "*Ellerth* did not discuss the scope of [Title VII's] general antidiscrimination provision," 548 U.S. at 65, and that it had spoken of a "'tangible employment action' . . . only to 'identify a class of [hostile work environment] cases' in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors," *id.* at 64 (alteration in original) (quoting *Ellerth*, 524 U.S. at 760–61). After *White*, no basis remains for thinking *Ellerth* supports, even implicitly, the approach adopted in *Brown*.

**2**

Finding no support in the statute or in *Ellerth*, our amicus and the dissent seek refuge in Supreme Court precedent dealing with the antiretaliation provision of Title VII. Our conclusion about the meaning of the antidiscrimination provision, however, is fully consistent with that precedent because there are fundamental differences between the antidiscrimination and the antiretaliation provisions.

The antiretaliation provision of Title VII, section 704(a), makes it an "unlawful employment practice for an employer to discriminate against . . . any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). In *White*, the Court identified the contours of this provision, concluding that

because it is "important to separate significant from trivial harms," 548 U.S. at 68, only a retaliatory act that is "materially adverse" to the plaintiff is actionable, *id.* at 67–68. The Court further concluded that the standard for judging "material adversity" must be objective, meaning it must be judged from the perspective of a reasonable employee, because this is a "judicially administrable" standard that "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69. The amicus argues that the reasons the Court provided for reading those limitations into the antiretaliation provision are just as applicable to the antidiscrimination provision.

This argument ignores a fundamental difference between the two provisions: Unlike the antidiscrimination provision, the antiretaliation provision is not expressly limited to actions affecting the terms, conditions, or privileges of employment. Reasoning that this terminological difference must "make a legal difference," *id.* at 63, the Court held that the antiretaliation provision prohibits even retaliatory actions that do not affect the terms, conditions, or privileges of employment, for example, an employer making a false criminal charge against an employee who had complained of discrimination, or a law enforcement agency refusing to investigate death threats made against an employee who had complained of discrimination, *id.* at 63–64 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1213 (D.C. Cir. 2006) and *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (10th Cir. 1996)).

It was only after adopting this expansive interpretation of the antiretaliation provision that the Court was faced with the problem of "separat[ing] significant from trivial harms." *Id.* at 68. The Court therefore looked outside the text of the provision for the necessary limiting principle. To that end, the Court

identified the purpose of the antiretaliation provision as preventing "employer interference with unfettered access to Title VII's remedial mechanisms" and concluded the provision should therefore be limited to "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers" or as the Court put it, employer actions that are "materially adverse" to an employee. *Id.* (internal quotation marks omitted). The Court then had to decide how best to measure the likely deterrent effect of a challenged action; as mentioned above, the Court adopted an objective approach because it is more judicially administrable.

None of these considerations applies to the antidiscrimination provision. By tethering actionable behavior to that which affects an employee's "terms, conditions, or privileges of employment," the antidiscrimination provision by its terms provides the necessary limiting principle. When the phrase "terms, conditions, or privileges of employment" is reasonably construed, there is no danger that faithful enforcement of the antidiscrimination provision will turn Title VII into a "general civility code" for the workplace, *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

Moreover, determining whether a challenged action relates to "terms, conditions, or privileges of employment" is a purely objective inquiry, well within the competence of a court. When it comes to the antidiscrimination provision, therefore, there simply is no need to engage in a "reasonable employee" inquiry to keep the court's task within manageable limits.

Our conclusion that the holding in *White* does not apply to the antidiscrimination provision is also more consistent with the different roles played by the two provisions. The role of the antiretaliation provision is to prevent "employer interference with unfettered access to Title VII's remedial

mechanisms." *White*, 548 U.S. at 68 (internal quotation marks omitted). A "material adversity" requirement, which excludes actions insufficient to deter an employee from seeking a remedy for a Title VII violation, is entirely consistent with this objective. The antidiscrimination provision, by contrast, aims "to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin," *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763 (1976), and to create "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status," *White*, 548 U.S. at 63. Thus, the antidiscrimination provision "seeks to prevent injury to individuals based on who they are," while "[t]he antiretaliation provision seeks to prevent harm to individuals based on what they do." *Id.*

Our dissenting colleagues also contend that precedent governing hostile work environment claims suggests that Title VII prohibits only objectively "'severe'" discrimination, assessed in terms of how it "'would reasonably be perceived' by someone in the employee's position." Dissenting Op. at 9 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993)). That defense of *Brown* fares no better. The thrust of the hostile work environment cases is that an abusive working environment amounts to a "*constructive* alteration[] in the terms or conditions of employment" only if harassment is severe or pervasive. *Ellerth*, 524 U.S. at 752 (emphasis added). Those cases have no bearing on a case in which an employer discriminates against an employee with respect to the *actual* terms or conditions of employment—for example, by transferring an employee to a new position because of the employee's race or sex.

13

Contrary to the dissent's characterization of the resulting jurisprudence as "harmless," Dissenting Op. at 22, grafting an "objectively tangible harm" requirement onto the antidiscrimination provision has had consequences glaringly inconsistent with the objectives of Title VII's antidiscrimination provision. One need look no further than this case. Under the "objectively tangible harm" requirement, an employer that denies an employee's request for a transfer because of the employee's sex (or race, etc.) would escape liability under Title VII unless the employee could show she suffered an "objectively tangible harm," even though the denial of the request unquestionably deprived the employee of an equal employment opportunity. Even more perverse, as our amicus conceded at oral argument, an employer that provides doughnuts every week for employees but hangs a "whites only" sign over the doughnuts has not caused an "objectively tangible harm" to non-white employees. Recording of Oral Arg. 2:04:12–2:05:48. That alone shows just how much the atextual requirement of "objectively tangible harm" frustrates Title VII's purpose of ending discrimination in the workplace.

## C

We are unpersuaded by our amicus's argument that the rule in *Brown* is necessary to shield employers from "judicial micromanagement of business practices." Amicus Br. 38 (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997)). Overruling *Brown*, he posits, would make a federal case out of "[a] salesperson transferred from sporting goods to power tools." *Id.* at 1. But of course, an employer remains free to transfer an employee from one department to another for no reason or for any reason at all—any reason, that is, except the employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). We disagree with the amicus that refusing to let women work in the

power tools department because of gender stereotypes, for example, is part of the "minutiae of personnel management" that escapes Title VII's notice. Amicus Br. 39 (internal quotation marks omitted). To the contrary, it is exactly the sort of workplace discrimination Title VII aims to extinguish. Yet, as the amicus conceded at oral argument, *Brown* allows employers to engage in that discrimination with impunity unless an employee can show some additional "objective" harm. Recording of Oral Arg. 1:50:58–1:52:06.

Moreover, well-established case law adequately protects employers from frivolous claims. If a Title VII plaintiff fails to plead "'sufficient factual matter'" to state a discrimination claim that is "'plausible on its face,'" then the district court should dismiss the case before discovery. *Harris v. D.C. Water & Sewer Authority*, 791 F.3d 65, 68 (D.C. Cir. 2015) (some internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And under the framework set forth in *McDonnell Douglas*, a Title VII plaintiff relying upon circumstantial evidence must establish "an inference of discrimination" before the burden shifts to the employer to "identify [a] legitimate, non-discriminatory" reason for its actions. *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015). To survive summary judgment, an employee claiming a discriminatory transfer denial therefore must show not only that the employee's transfer request was rejected, but that it "'was rejected *under circumstances which give rise to an inference of discrimination*.'" *Harding v. Gray*, 9 F.3d 150, 152 (D.C. Cir. 1993) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). These doctrines provide employers ample opportunity to terminate an unmeritorious discrimination claim without reading an extra-textual limitation into Title VII.

15

At bottom, our disagreement with our amicus and the dissent is this. In their view, the *Brown* rule is necessary to "screen out cases involving objectively insubstantial injuries alleged to flow from garden-variety workplace assignments and interactions." Dissenting Op. at 30. In our view, we ought to read Title VII to mean what it says—that it prohibits any "discriminat[ion] against [an] individual with respect to . . . terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), even if that that discrimination is "garden-variety." This saves courts the trouble of administering an open-ended requirement of objectively material injury found nowhere in the statute's text. And it is more consistent with the statute's "intent to strike at the entire spectrum of disparate treatment . . . in employment." *Meritor*, 477 U.S. at 64 (internal quotation marks omitted).

**III**

Having concluded that *Brown* is wrong, we now consider whether to set it aside. Our court, like the Supreme Court, observes the doctrine of stare decisis—"'the idea that today's [c]ourt should stand by yesterday's decisions.'" *Allegheny Defense Project v. FERC*, 964 F.3d 1, 17 (D.C. Cir. 2020) (en banc) (alteration in original) (quoting *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015)). Even in the rare instances in which it is appropriate to grant rehearing en banc, departure from stare decisis "'demands special justification.'" *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871, 875 (D.C. Cir. 1992) (en banc) (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). We have also explained, however, that stare decisis applies with less force to our opinions than to those of the Supreme Court, both because the circuit courts "play a different role in the federal system" and because our precedent "is

generally established by the majority vote of just three circuit judges." *Id.* at 876.

We have previously identified two main reasons for overruling circuit precedent. First, "it is appropriate for the en banc court to set aside circuit precedent when, 'on reexamination of an earlier decision, it decides that the panel's holding on an important question of law was fundamentally flawed.'" *Allegheny*, 964 F.3d at 18 (quoting *Critical Mass*, 975 F.2d at 876). "We also may depart from circuit precedent when 'intervening development[s]' in the law—such as Supreme Court decisions—'ha[ve] removed or weakened the conceptual underpinnings from the prior decision[.]'" *Id.* (alterations in original) (quoting *United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc)). Both reasons support overruling *Brown*.

*Brown* is fundamentally flawed because it "elevated policy concerns . . . over the plain statutory text." *Id.* at 17. The plain text of section 703(a)(1) contains no requirement that an employee alleging discrimination in the terms or conditions of employment make a separate showing of "objectively tangible harm." Members of this court have repeatedly noted that *Brown* is therefore out of step with the "straightforward" meaning of Title VII. *Chambers*, 988 F.3d at 503 (Tatel and Ginsburg, JJ., concurring); *see, e.g.*, *Ortiz-Diaz*, 867 F.3d at 81 (Kavanaugh, J., concurring) ("[T]ransferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes discrimination with respect to 'compensation, terms, conditions, or privileges of employment' in violation of Title VII." (quoting 42 U.S.C. § 2000e-2(a)). Our dissenting colleagues contend that this defect is insufficiently serious to overcome stare decisis, but it is exactly the same defect we relied on in *Allegheny*. *See* Dissenting Op. at 19–21. In that

case, the en banc court held that a panel decision was fundamentally flawed because, like *Brown*, it failed to comport with the Supreme Court's command to "'enforce plain and unambiguous statutory language . . . according to its terms.'" *Allegheny*, 964 F.3d at 18 (quoting *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020)). "Because the approach to statutory construction reflected in [*Brown*] was fundamentally flawed and grounded in a mode of statutory construction that has been foreclosed by the Supreme Court, *stare decisis* principles do not stand in the way of the en banc court holding that [Title VII's antidiscrimination provision] means what it says." *Id.*

In addition, as explained above, the Supreme Court's decision in *White*, decided seven years after *Brown*, has overtaken *Brown*'s reasoning. *White* clarified that *Ellerth* required a showing of tangible harm only to identify a subset of hostile work environment cases in which vicarious liability would attach. *White*, 548 U.S. at 64. Therefore, *Ellerth* no longer furnishes any support for *Brown*'s atextual interpretation of the statute.

In overruling *Brown*, we acknowledge that the other circuits that have addressed the question have held that a plaintiff challenging the denial of a transfer under Title VII's antidiscrimination provision must make some additional showing of tangible harm. Those circuits, however, speak with discordant voices when it comes to the sort of harm that can support a claim of a discriminatory job transfer. The Fifth Circuit, for example, has held that "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (per curiam) (cleaned up). The Fourth Circuit has held just the opposite—that Title VII allows claims

for "[c]onduct short of ultimate employment decisions" in job reassignment cases. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375–76 (4th Cir. 2004) (internal quotation marks omitted). Both the Fifth and Eleventh Circuits consider a transfer to be an actionable demotion if the new position is "less prestigious or less interesting." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (internal quotation marks omitted); *see Hinson v. Clinch County*, 231 F.3d 821, 830 (11th Cir. 2000) (finding "a genuine issue of fact as to whether the new job was less prestigious"). The Seventh Circuit disagrees, holding that moving an employee "from an interesting job she liked that involved overseeing several other people to a boring job she didn't like and that lacked any supervisory duties" falls short of an adverse employment action. *Place v. Abbott Laboratories*, 215 F.3d 803, 810 (7th Cir. 2000). In one nonprecedential opinion, the Sixth Circuit faulted an employee for adducing evidence of the prestigiousness of "postmaster positions *in general*" rather than evidence specific to the city where he sought a transfer to a postmaster position. *Freeman v. Potter*, 200 F. App'x 439, 445 (6th Cir. 2006).

Two recent cases illustrate this wide divergence in how other circuits treat discriminatory transfers. In *EEOC v. AutoZone, Inc.*, a Black employee's supervisor told him that he was being transferred to work in a different neighborhood because the company wanted to keep his workplace "predominantly Hispanic." 860 F.3d 564, 565 (7th Cir. 2017) (internal quotation marks omitted). Although that case dealt with a different provision of Title VII, section 703(a)(2), the Seventh Circuit indicated that the transfer at issue would not amount to an adverse employment action because, in its view, it insufficiently harmed the employee. *Id.* at 569–70. By contrast, the Sixth Circuit held that discriminatory transfers are actionable so long as the resulting harm is more than "de minimis." *Threat v. City of Cleveland*, 6 F.4th 672, 679 (6th

Cir. 2021). That court concluded that a job transfer surmounted this bar when the only change in the employee's job was not receiving a shift on his "preferred day" of the week. *Id.* The dissent downplays differences among the circuits as the sort of "narrow disagreements" to be expected when courts apply a "qualitative" standard. Dissenting Op. at 26. But it is hardly a point in *Brown*'s favor that its rule is so amorphous as to accommodate inconsistent outcomes in like cases.

Our own precedents applying *Brown* are no less muddled. One panel held that refusing to transfer an employee to a position "higher in the hierarchy" of a government agency satisfied *Brown*'s requirement of "objectively tangible harm." *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003). By contrast, another panel rejected a claim by an agency employee who lost his temporary position as a section chief and was made a unit chief "within [another] section." *Forkkio*, 306 F.3d at 1129–31. One panel held that the "inconvenience" of a "less favorable schedule" was enough to support a claim for a discriminatory transfer, *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008), but another panel held that *Brown* barred a claim based on a "shift change" to a "generally less favorable" shift, *Jones v. D.C. Department of Corrections*, 429 F.3d 276, 281 (D.C. Cir. 2005). More recently, a divided panel held that an employee suffered no "objectively tangible harm" when he was "denied a transfer away from a racially and ethnically biased supervisor to a non-biased supervisor more likely to advance his career," only to reverse course on rehearing. *Ortiz-Diaz*, 867 F.3d at 71, 73–74.

We have time and again wrestled with *Brown*'s requirement of "objectively tangible harm." *See, e.g.*, *Ortiz-Diaz*, 867 F.3d at 74; *Stewart*, 352 F.3d at 426; *Forkkio*, 306 F.3d at 1131; *Currier v. Postmaster General*, 304 F.3d 87, 88 (2002); *Russell v. Principi*, 257 F.3d 815, 818 (2001);

*Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 844 (2001); *Maramark v. Spellings*, No. 06-5099, 2007 WL 2935411, at *1 (Sept. 20, 2007). Our district judges have done so in dozens more cases. *See, e.g.*, *Savage v. Azar*, 301 F. Supp. 3d 114, 129 (2018); *Halcomb v. Office of the Senate Sergeant-at-Arms*, 563 F. Supp. 2d 228, 240 (2008); *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 308 (2005). These cases have consumed enormous judicial resources seeking to answer a question far removed from the core Title VII inquiry—whether an employer has discriminated against an employee based on a protected characteristic. And they leave district courts adrift with a line-drawing exercise unmoored from the statutory text. Both our court's experience and that of our sister circuits have proven *Brown*'s standard largely unadministrable. Neither practical nor doctrinal reasons justify persisting in this course.

Not a single member of this court truly advocates retaining *Brown* in its present form, the dissent's invocation of stare decisis notwithstanding. The dissent would uphold *Brown* only after draining it of substance and recasting it as a de minimis rule. That revisionist account is belied by our two-decade misadventure in applying *Brown*, and as Judge Walker correctly points out in his separate opinion, by the outcome in *Brown* itself. Thus, the real point of contention is how to interpret Title VII's antidiscrimination provision. We interpret it consistent with its text to prohibit all discrimination in the terms or conditions of employment.

## IV

Without any footing in the text of Title VII or Supreme Court precedent, there is no sound basis for maintaining *Brown* as circuit law. For these reasons, we overrule *Brown* and hold that discriminatory job transfers are actionable under Title VII.

We remand the case to the merits panel for disposition consistent with this opinion.

*So ordered.*

WALKER, *Circuit Judge*, concurring in the judgment in part, dissenting in part.

Title VII of the Civil Rights Act prohibits employment discrimination based on "race, color, religion, sex, or national origin."[1] To prevail on an antidiscrimination claim under Title VII, plaintiffs must prove that they have suffered a non-de minimis injury. That standard is far from onerous. It requires only a showing that the injury is not "trifling" or "negligible."[2]

Today, the Court could have clarified and embraced that standard. Instead, it leaves open the possibility that plaintiffs can successfully sue over de minimis injuries. That makes an imperfect situation even worse — worse, that is, for everyone except those who will profit from unjustified settlements and expensive trials over the kinds of de minimis slights that Title VII does not cover.

I

Title VII's antidiscrimination provision makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.[3]

With that provision, "Congress intended to prohibit all practices in whatever form which create inequality in

---

[1] 42 U.S.C. § 2000e-2(a)(1).

[2] *See De Minimis*, Black's Law Dictionary (11th ed. 2019) (cleaned up).

[3] 42 U.S.C. § 2000e-2(a)(1).

employment opportunity due to discrimination on the basis of race, religion, sex, or national origin."[4] It also protects against workplace harassment that becomes so "severe or pervasive" as to alter a "term, condition, or privilege of employment."[5]

*Brown v. Brody* interpreted Title VII's antidiscrimination provision to require plaintiffs to show that they suffered an injury that a "reasonable trier of fact" would deem "objectively tangible harm."[6] By that, *Brown* may have meant objectively "material" harm.[7] But its reference to "tangible" harm appeared to set a higher bar that has caused confusion in the years since.[8]

Each of today's opinions says the proper bar is not as high as *Brown* made it sound. That leaves only the question of how high the bar really is.

For the reasons explained by Judge Katsas, the answer is that Title VII's antidiscrimination provision makes actionable only objectively material harm.[9] And rather than repeat his reasons, I join parts of I, II, III.A, III.B, and V of his opinion insofar as they are consistent with this opinion.

I add two brief additional points. First, although we can learn from our Court's "two decades of judicial experience in distinguishing substantial harms from insubstantial ones,"[10] I would give future panels license to break from those moments

---

[4] *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763 (1976).
[5] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (cleaned up).
[6] 199 F.3d 446, 457 (D.C. Cir. 1999).
[7] Dissent at 6.
[8] *Brown*, 199 F.3d at 457.
[9] Dissent at 7-13.
[10] Dissent at 34.

in our Court's past when it was not faithful to the standard as Judge Katsas explains it today.

Second, for the same reasons Judge Katsas applies the objectively-material-injury standard to the antidiscrimination provision, the de minimis principle applies as well. The "maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept."[11] It is an "old law maxim" that parallels a more modern idiom: Don't make a federal case out of every perceived slight.[12] And nothing indicates that Congress intended to displace the de minimis principle in Title VII's antidiscrimination provision.[13] That provision is not "all about trifles,"[14] nor is it a "general civility code for the American workplace."[15]

I see little if any gap between a non-de-minimis-injury standard (like that proposed by the District of Columbia, embraced by the Sixth Circuit in *Threat v. City of Cleveland*, and left open as a possibility by today's decision) and the correct understanding of an objectively-material-injury

---

[11] *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).

[12] *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 268 (1796) (opinion of Iredell, J.).

[13] *See Threat v. City of Cleveland*, 6 F.4th 672, 678-79 (6th Cir. 2021).

[14] *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 234 (2014) (emphasis omitted).

[15] *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).

standard (like that explained by Judge Katsas).[16] After all, an injury is non-de minimis when it causes more than "trifling" or "negligible" harm.[17] And an injury is material when it causes more than "trivial harms."[18] In this context, it is hard to detect any difference between "trifling," "negligible," and "trivial."[19]

## II

Under a non-de-minimis- or objectively-material-injury standard, the next question is whether job transfers are actionable. There are at least three possible answers. One, which Chambers proposes and the Court adopts, creates a categorical rule that all job transfers are actionable.[20] Another, which our precedents have understood *Brown v. Brody* to impose, says that no job transfers are actionable absent a separate showing of additional harm.[21] The third avoids a

---

[16] *Compare Threat*, 6 F.4th at 679, *with* dissent at 8, 13.

[17] *See De Minimis*, Black's Law Dictionary (11th ed. 2019) (cleaned up).

[18] *See White*, 548 U.S. at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.").

[19] In addition, whether we call the standard non-de minimis or material, the Supreme Court has made clear that it must be an objective inquiry. *See id.* ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.").

[20] Majority at 8.

[21] *See Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999); *see also Ortiz-Diaz v. U.S. Department of Housing & Urban Development*, 867 F.3d 70, 74 (D.C. Cir. 2017) ("lateral transfers to different positions within a Department offering the same pay and benefits are ordinarily not changes in the terms, conditions, or privileges of employment" (cleaned up)); *id.* at 81 (Kavanaugh, J., concurring) ("Our precedents hold that discriminatory transfers (and

categorical rule for the ill-defined category of job transfers and instead approaches job transfers as we would any other employment action, by asking whether the plaintiff suffered material harm.

Judge Katsas's opinion favors the third approach.[22] It rejects a categorical rule. For two reasons, I agree.

First, categorical rules aren't real rules when the category is undefined. And as Judge Katsas and our precedents show, "job transfers" are not a defined category of employment actions.[23] So either categorical rule would take courts on a detour from the proper inquiry (whether a plaintiff has suffered material harm) to a labeling game about whether an employment action meets the definition of something (a job transfer) that has no clear definition.

Second, neither categorical rule accurately applies the materiality standard. An all-job-transfers-are-actionable rule disregards the reality that the harm from some job transfers is de minimis. For example, a city that is restructuring its police department could change an employee's title from "head detective" to "chief investigator" without altering the role. Is that a job transfer? Possibly. Is the change in the chief

---

discriminatory denials of transfers) are ordinarily not actionable under Title VII.").

[22] Dissent at 13.

[23] Dissent at 28-29; *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("Because of the equality of pay and benefits, we may call it a lateral transfer, but in reality, it is more similar to a denial of a promotion").

investigator's terms, conditions, and privileges of employment negligible? Almost certainly.[24]

In light of possibilities like that, it is not clear how to reconcile the categorical rule Chambers proposes with the de minimis standard that Title VII requires. Perhaps "job transfer" incorporates a non-de minimis alteration of duties, location, or other terms and conditions of the job. That seems to be the District of Columbia's quite reasonable approach.[25] If the Court agrees with the District of Columbia, it could say so.

On the other extreme is a rule that says no job transfers are actionable absent additional harm like a change in salary or benefits. That rule is at least as misguided as its opposite. No opinion in today's case endorses it.

Unfortunately, the same cannot be said for some of our precedents. One case, for example, concluded that the denial of a transfer from Washington, D.C. to Albany, New York wasn't actionable.[26] Another case held that moving an employee from a position where he collected a paycheck while doing no work to a job with significant responsibilities wasn't actionable either.[27] But a move to a different state is not a

---

[24] I say "almost" because it would be material if the employer said the change was because of race: When the racism of an act is overt and undeniable, the act is material for the same reasons Judge Katsas explains that separate doughnuts would be actionable. Dissent at 31-32 n.5.

[25] District of Columbia En Banc Brief at 8.

[26] *Ortiz-Diaz v. U.S. Department of Housing & Urban Development*, 831 F.3d 488, 492 (D.C. Cir. 2016), *rev'd on other grounds by Ortiz-Diaz*, 867 F.3d 70 (D.C. Cir. 2017).

[27] *Currier v. Postmaster General*, 304 F.3d 87, 88-89 (D.C. Cir. 2002).

negligible alteration of the terms and conditions of employment, nor of course is a significant increase in job responsibilities.

Instead of attempting to impose a categorical rule, we should ask in each case whether the change in the employee's job was material. That approach respects the necessarily fact-intensive nature of the de minimis standard. Under it, plenty of cases are obviously actionable, like moving an employee to another city,[28] forcing her to take the night shift,[29] or transferring her from forklift operator to basic laborer.[30]

The job transfer in *Brown* itself should have fit that bill, and it would have had *Brown* not misapplied its stated objective-materiality standard. Regina Brown was a loan officer at the Export-Import Bank.[31] She had been working in the Bank's Africa/Middle East Division, a role that had foreign-policy elements.[32] Then, when the Bank reorganized its staff, it transferred her to its Contracts Administration Division, where she had a quite different set of duties.[33] That transfer was a material change in her terms of employment, contrary to *Brown*'s conclusion.[34]

That error, combined with *Brown*'s reference to "tangible harm," has caused confusion.[35] As noted above, we have rejected actionable claims. We have asked plaintiffs to show

---

[28] *Ortiz-Diaz*, 831 F.3d at 492.

[29] *Threat v. City of Cleveland*, 6 F.4th 672, 679 (6th Cir. 2021).

[30] *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 71 (2006).

[31] *Brown*, 199 F.3d at 448.

[32] *Id.* at 448-49.

[33] *Id.* at 449.

[34] *See White*, 548 U.S. at 70-71.

[35] 199 F.3d at 457.

an "extraordinary reduction in responsibilities" or "significantly diminished" duties rather than a material change.[36] And we have repeatedly had to reverse district court determinations that harms are immaterial in what should have been straightforward cases.[37]

\*     \*     \*

Our post-*Brown* confusion led plaintiffs like Mary Chambers to litigate under the misapprehension that they must show more of an injury than a job transfer with meaningfully different job responsibilities. Today's en banc court can provide Chambers with an opportunity to meet a clarified standard, and I would vacate and remand in order to do so. I therefore join the part of the Court's judgment that vacates and remands to the District Court.[38]

But on remand, I would require Chambers to show that the denial of her requested job transfer was a non-de minimis injury — in other words, that the requested job transfer

---

[36] *Youssef v. FBI*, 687 F.3d 397, 402 (D.C. Cir. 2012) (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)); *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007).

[37] *See, e.g.*, *Youssef*, 687 F.3d at 399-400, 402 (a move from coordinating counterintelligence operations to bagging and tagging evidence); *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001) (involuntary transfer to the night shift).

[38] The majority remands to the merits panel. As I understand it, the panel will need to vacate the district court's grant of summary judgment and remand for the district court to address the District of Columbia's separate argument that Chambers did not raise a dispute of material fact as to D.C.'s motive for denying her a transfer. As I would also vacate and remand for further summary-judgment proceedings, I join based on that understanding.

included objectively material differences in job responsibilities.

Title VII requires that standard.  It "is not especially onerous."[39]  A job transfer can often — though not always — clear that low bar.

---

[39] Dissent at 2.

KATSAS, *Circuit Judge*, with whom *Circuit Judges* HENDERSON and RAO join, dissenting: This case turns on what kinds of injuries support disparate-treatment claims under Title VII of the Civil Rights Act of 1964. In *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), we held that an allegedly discriminatory transfer from one job to another, or an allegedly discriminatory denial of a transfer, is not actionable unless it is "materially adverse" to the employee when viewed "objectively" from the perspective of a reasonable person in the employee's position. *Id.* at 457. This rule is consistent with statutory text, longstanding Supreme Court precedent, and the bedrock principle that Title VII is not a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). For more than two decades, we have applied *Brown*'s requirement of an objectively material injury both inside and outside the specific context of job transfers. Our district court likewise has applied *Brown* in scores if not hundreds of cases. And every other circuit has followed *Brown*, in name or in substance.

My colleagues today overrule this landmark precedent, but they give no sound justification for breaking so sharply from law so settled. First, they argue that *Brown* was insufficiently grounded in the relevant legal text. That contention is mistaken, and it would not justify a departure from statutory *stare decisis* even if it were correct. Second, they argue that intervening decisions have undermined *Brown*. But the passage of time has only made *Brown* stronger: One circuit after another has agreed with it, and the most relevant later Supreme Court decision, *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), strongly reinforced *Brown* by requiring plaintiffs to show an objectively material injury to pursue retaliation claims under Title VII. Third, my colleagues argue that *Brown* has proven un-administrable. That conclusion is also mistaken, and it overlooks that *White* requires essentially the same standard for retaliation claims as *Brown* requires for disparate-treatment claims.

Today's decision may have sweeping consequences and will cause substantial uncertainty regardless. My colleagues formally limit their decision to job-transfer claims, explain that not every workplace slight affects the terms and conditions of employment, and reserve the possibility that Title VII may not extend to *de minimis* injuries. But the decision cannot fairly be confined to job transfers; just as the logic of *Brown* easily extends to all disparate-treatment claims, so does the anti-*Brown* logic now embraced by my colleagues. To keep today's decision within manageable limits, courts will have to build up either a new jurisprudence of what counts as terms or conditions of employment (an inquiry we have previously undertaken only in the context of harassment claims), or a new jurisprudence firmly applying the *de minimis* canon in this context, or both. These undertakings may fail, in which case the floodgates will open. And if they succeed, the relevant decisions will simply track our *Brown* jurisprudence, albeit under another doctrinal label.

Why throw the law into such disarray? My colleagues flag decisions that, in their view, inappropriately dismissed claims alleging substantial injuries. Given the volume of decisions applying the *Brown* rule, the existence of individual cases that seem overly generous to employers (or, for that matter, of individual cases that seem overly generous to employees) is hardly surprising. But rather than tossing aside two decades of precedent, I would simply remind the district courts what much of our *Brown* caselaw has already made clear—that the requirement of an objectively material injury, although important, is not especially onerous.

For these reasons, and as explained further below, I respectfully dissent from the decision to overrule *Brown*.

I

Title VII of the Civil Rights Act prohibits employment discrimination based on race, sex, or other inappropriate considerations.  Section 703(a)(1) of the Act, the core anti-discrimination provision of Title VII, makes it unlawful for an employer "to fail or refuse to hire or to discharge … or otherwise to discriminate against" any individual, "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Section 704(a), the anti-retaliation provision, makes it unlawful for any employer "to discriminate against" any employee "because he has opposed any practice" prohibited by Title VII "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *Id.* § 2000e-3(a).  Section 706 affords a private right of action to any person "claiming to be aggrieved" by a violation of Title VII.  *Id.* § 2000e-5(f)(1).

In *Brown*, we considered when transfers from one job to another may support disparate-treatment claims under section 703(a)(1).  Surveying sixteen lower-court decisions, we noted "wide and deep" authority for the proposition that a lateral transfer does not necessarily inflict a "materially adverse" actionable injury.  199 F.3d at 455–56 (cleaned up).  We also explained that *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), invoked this line of authority to hold that, in cases involving sexual harassment by a supervisor, the employer is automatically liable if, but only if, the supervisor took some "tangible employment action" against the employee.  199 F.3d at 456–57.  Given all this, we announced "the following rule":

> a plaintiff who is made to undertake or who is denied a
> lateral transfer—that is, one in which she suffers no

4

> diminution in pay or benefits—does not suffer an
> actionable injury unless there are some other *materially
> adverse* consequences affecting the terms, conditions,
> or privileges of her employment or her future
> employment opportunities such that a reasonable trier
> of fact could conclude that the plaintiff has suffered
> *objectively tangible* harm.  Mere idiosyncra[s]ies of
> personal preference are not sufficient to state an injury.

*Id.* at 457 (emphases added).  Applying this rule, we held that the plaintiff in *Brown* had alleged only an idiosyncratic preference for one position over another, thus giving us "no objective basis" to find a material injury.  *See id.*

We have applied this rule in numerous cases since *Brown*. In doing so, we have found sufficient harm in cases involving, among other things, a transfer to the night shift, *Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001), or to a shift with irregular hours, *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008).  Repeatedly, we have found sufficient harm if the employee was transferred to a position with less attractive job responsibilities.  *See*, *e.g.*, *Youssef v. FBI*, 687 F.3d 397, 401 (D.C. Cir. 2012) (new position "did not utilize [Youssef's] skills and expertise" (cleaned up)); *Geleta v. Gray*, 645 F.3d 408, 412 (D.C. Cir. 2011) (new position involved "complete loss of supervisory responsibilities"); *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 608 (D.C. Cir. 2010) (lawyer transferred "to a non-legal position"); *Czekalski v. Peters*, 475 F.3d 360, 364–65 (D.C. Cir. 2007) ("diminished … supervisory and programmatic responsibilities"); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("extraordinary reduction in responsibilities"). Likewise, we have held that the denial of a transfer to a "supervisor's position" caused sufficient harm, *Stewart v. Ashcroft*, 352 F.3d 422, 426–27 (D.C. Cir. 2003), as did the

denial of a transfer "away from a biased supervisor," *Ortiz-Diaz v. HUD*, 867 F.3d 70, 74 (D.C. Cir. 2017). In contrast, we have held that an employee's "[p]urely subjective" dissatisfaction with a new position is insufficient to support a claim, as are objective but "not sufficiently significant" slights such as being excluded from certain management meetings or e-mails. *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002); *see Currier v. Postmaster Gen.*, 304 F.3d 87, 88–89 (D.C. Cir. 2002) (transfer away from a "do nothing position" to one "with some duties"); *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) ("minor changes in work-related duties or opportunities").

We have also applied *Brown* outside the job-transfer context, to screen out disparate-treatment claims involving other objectively insubstantial alleged injuries. *See*, *e.g.*, *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (critical comments and shouting); *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009) (failure to recommend employee for a Presidential Rank Award); *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007) (employee subjectively "fe[lt] undermined" (cleaned up)); *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006) (attorney's loss of opportunity to submit briefs "directly to a top supervisor"); *Taylor v. Small*, 350 F.3d 1286, 1292–93 (D.C. Cir. 2003) (placement on performance improvement plan); *Russell v. Principi*, 257 F.3d 815, 818–19 (D.C. Cir. 2001) (poor performance rating, unconnected to any "bonus differential"). The common theme of these cases is that section 703(a)(1) does not cover "everything that makes an employee unhappy" at work. *Id.* at 818 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

In considering what constitutes an objectively material injury, these decisions have treated disparate-treatment claims

under section 703(a)(1) and retaliation claims under section 704(a) as interchangeable. *See*, *e.g.*, *Forkkio*, 306 F.3d at 1130–32; *Holcomb*, 433 F.3d at 902; *Douglas*, 559 F.3d at 552.

## II

Plaintiff Mary Chambers works in the child support division of the Office of the Attorney General of the District of Columbia. Beginning in 2008, Chambers repeatedly sought to be transferred from the interstate unit of that division to its intake unit. As her requests were denied, Chambers filed charges with the Equal Employment Opportunity Commission. After the EEOC declined to pursue her claims, Chambers filed this lawsuit alleging that the transfer denials reflected both sex discrimination and retaliation. She produced no evidence that the intake unit offered employees any better work, pay, hours, advancement opportunity, prestige, or other benefits than did the interstate unit. Applying *Brown*, the district court granted summary judgment to the District of Columbia. *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 93–94 (D.D.C. 2019).

A panel of this Court affirmed, also based on *Brown*. *Chambers v. District of Columbia*, 988 F.3d 497, 501–02 (D.C. Cir. 2021) (per curiam). But the panel called for the en banc Court to reconsider *Brown* and overrule it. *See id.* at 502–06 (Tatel and Ginsburg, JJ., concurring).

## III

In holding that disparate-treatment claims require the plaintiff to suffer an objectively material injury, *Brown* was correctly decided as a matter of statutory text, Supreme Court precedent, and the courts' general authority to interpret express statutory injury requirements.

7

A

Section 703(a)(1) makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," because of prohibited considerations such as race or sex. 42 U.S.C. § 2000e-2(a)(1). Section 706 authorizes private civil actions by any individual "aggrieved" by a violation of section 703(a)(1). *Id.* § 2000e-5(f)(1). *Brown*'s requirement of an objectively material injury follows from these provisions.

At an absolute minimum, the plaintiff must have suffered some injury. Start with the phrase "discriminate against." In *White*, which involved a retaliation claim under section 704(a), the Supreme Court, citing precedent under section 703(a)(1), said "[n]o one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that *injure* protected individuals." 548 U.S. at 59 (emphasis added). And in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which involved section 703(a)(1), the Court cited *White* for the proposition that "[t]o 'discriminate against' a person … would seem to mean treating that individual *worse* than others who are similarly situated." *Id.* at 1740 (emphasis added). Moreover, a private plaintiff must be "aggrieved" by a Title VII violation. In common usage, "aggrieved" means "[h]aving suffered loss or injury." Black's Law Dictionary 87 (revised 4th ed., 1968). In civil-rights usage as well, an "aggrieved" person is one who has "been injured by" an unlawful practice. 42 U.S.C. § 3602(i)(1) (Fair Housing Act definition). So, both the substantive and private-cause-of-action provisions of Title VII require a plaintiff to have been injured by an act of employment discrimination.

Not every workplace slight constitutes discrimination against an aggrieved employee. As the Supreme Court has explained, "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wis. Dep't of Rev. v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). Nothing in Title VII abrogates this background principle. To the contrary, as many courts have recognized, not every petty annoyance rises to the level of "discriminat[ion] against" an employee. *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021) (Sutton, J.) ("To 'discriminate' reasonably sweeps in some form of an adversity and a materiality threshold."); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) (Easterbrook, J.) ("Congress *could* make any identifiable trifle actionable, but the undefined word 'discrimination' does not itself command judges to supervise the minutiae of personnel management."). For these reasons, a disparate-treatment plaintiff must prove an injury that is at least *material* in the sense of being more than *de minimis*.

The requirement of an objectively material injury is confirmed by the canon of *ejusdem generis*, "which limits general terms that follow specific ones to matters similar to those specified," *CSX Transp., Inc. v. Ala. Dep't of Rev.*, 562 U.S. 277, 294 (2011) (cleaned up). In section 703(a)(1), the term "otherwise to discriminate against" is a general phrase that follows specific adverse employment actions—"to fail … to hire," to "refuse to hire," or "to discharge." Construing the statutory prohibition on age discrimination, which in pertinent part is identically worded, the Supreme Court has invoked *ejusdem generis*. *Babb v. Wilkie*, 140 S. Ct. 1168, 1176 n.4 (2020). Because the specific verbs here denote employment actions that cause objectively material harm, the canon

similarly focuses the phrase "otherwise to discriminate against." To be sure, this phrase sweeps more broadly than the specific prohibitions regarding hiring and firing, but it is not a limitless catch-all for any workplace act, no matter how trivial.

*Brown* finds further support in section 703(a)(1)'s limitation to acts regarding the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Consider the Supreme Court's interpretation of this language in cases involving workplace harassment. In that context, the Court has imposed materiality and objectivity requirements to screen out claims of insubstantial harm. To direct harassing conduct at members of one race or sex is to "discriminate against" the targets "because of" their race or sex. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Yet not all discriminatory workplace harassment violates section 703(a)(1). Instead, harassment is deemed to alter the "terms, conditions, or privileges of employment," and thus is actionable, only if it is "severe or pervasive" enough to create "an abusive working environment." *Id.* at 67 (cleaned up). Moreover, this "severe or pervasive" requirement must be assessed "objectively," in terms of how the harassment "would reasonably be perceived" by someone in the employee's position. *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993). And this requirement "prevents Title VII from expanding into a general civility code." *Oncale*, 523 U.S. at 81. These cases all make clear that some acts of harassment, even if discriminatory and in the workplace, do not "sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21–22.[1]

---

[1]  I do not mean to suggest that the severe-or-pervasive requirement developed in the harassment cases directly controls conventional claims of disparate treatment. *Cf. ante* at 12. Rather, my point is simply that the harassment cases understand the

10

B

*White*, which imposes an objectively material harm requirement for retaliation claims under Title VII, cinches up the case for *Brown*. The Court rendered two distinct holdings in *White*. First, because section 704(a) contains no "terms, conditions, or privileges of employment" requirement, actionable retaliation may take the form of adverse action outside the workplace. *See* 548 U.S. at 61–67. Second, because section 704(a) requires the employer to "discriminate against" the plaintiff, it "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. The Court then spelled out the nature of the requisite injury—the plaintiff "must show that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a *reasonable* worker from making or supporting a charge of discrimination." *Id.* at 68 (cleaned up and emphases added). In justifying a "*material* adversity" standard, the Court held it "important to separate significant from trivial harms," because Title VII "does not set forth 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale*, 523 U.S. at 80). Likewise, an employee's "decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* In justifying a "*reasonable* employee" standard, the Court stressed that the

conditions-of-employment requirement to screen out claims for objectively insubstantial injuries. For their part, my colleagues agree that this requirement must be "reasonably construed" to prevent Title VII from becoming a "'general civility code' for the workplace." *Id.* at 11 (quoting *Oncale*, 523 U.S. at 81). But they give no further guidance on how to distinguish which employment actions are material enough to affect the conditions of employment—the inquiry that we have long performed under *Brown*.

assessment of harm "must be *objective*," to avoid "unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings" and to conform to the "objective standards" used in other Title VII contexts such as constructive discharge and hostile work environment. *Id.* at 68–69 (second emphasis added).

*White*'s second holding textually governs section 703(a)(1). Like section 704(a), section 703(a)(1) makes it unlawful "to discriminate against" an individual for a prohibited reason. The Supreme Court has long recognized a "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Although defeasible by context, this presumption of consistent usage applies most strongly where the two provisions are closely connected. *See, e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 171–73 (2012). Here, sections 703(a)(1) and 704(a) appear almost immediately next to each other, at the beginning of the two most prominent sections of Title VII. They share many common words and phrases: Section 703, titled "Unlawful employment practices," states in its subsection (a) that "[i]t shall be an unlawful employment practice for an employer— (1) … to discriminate against any individual" with respect to terms or conditions of employment "because of" the individual's protected characteristics. 42 U.S.C. § 2000e-2(a)(1). Section 704, titled "Other unlawful employment practices," states in its subsection (a) that "[i]t shall be an unlawful employment practice for an employer to discriminate against" any employee or applicant for employment "because" that person has been involved in enforcing Title VII. *Id.* § 2000e-3(a). And the provisions are linked thematically as well as textually, given the Supreme Court's holding that

retaliation based on complaints of discrimination is itself a form of discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005). For these reasons, because "discriminate against" requires an objectively material injury as used in section 704(a), it also requires an objectively material injury as used in section 703(a)(1).

*White*'s reasoning also carries over to section 703(a)(1). As to materiality, the need "to separate significant from trivial harms," 548 U.S. at 68, applies to disparate-treatment claims as well as to retaliation claims. To be sure, section 704(a) applies to acts not affecting conditions of employment, and thus is broader than section 703(a)(1) in that one respect. *See White*, 548 U.S. at 61–63. But there is no necessary correlation between whether an adverse act relates to employment and whether it is substantial or trivial. Adverse acts outside the workplace may be quite serious, such as filing false criminal charges against an employee or failing to investigate death threats against her. *See id.* at 63–64. And adverse acts inside the workplace may be quite trivial, such as not allowing an attorney to submit her draft briefs "directly to a top supervisor." *Broderick*, 437 F.3d at 1233. Moreover, *White*'s observation that an "objective standard" of materiality "is judicially administrable," whereas a subjective one would produce "uncertainties and unfair discrepancies," applies equally to harms alleged to flow from disparate treatment. *See* 548 U.S. at 68–69. And *White* grounded its "objective standard" of harm in the standards used "in other Title VII contexts" such as constructive discharge and hostile environment, both of which are actionable under section 703(a)(1). *See id.* at 69.[2]

---

[2] My colleagues treat *White*'s second holding (that retaliation claims require an objectively material injury) as predicated on its first holding (that retaliation can involve adverse action unrelated to conditions of employment). *Ante* at 10–11. But the Court did not

*White* also sheds light on the appropriate treatment of cases involving a reassignment of job responsibilities. The employee in *White* had been reassigned from "forklift duty" to seemingly less attractive "standard track laborer tasks" (which involved janitorial functions like trash removal). 548 U.S. at 57, 70. The Court acknowledged that reassignments *often* impose objectively material harms, because "[a]lmost every job category involves some responsibilities and duties that are less desirable than others." *Id.* at 70. Yet the Court also made clear that the plaintiff must *prove* the harm in each case. It stressed that "reassignment of job duties is not automatically actionable." *Id.* at 71. And building on its harassment decisions, the Court explained that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting *Oncale*, 523 U.S. at 81) (cleaned up). Not surprisingly, the Court found that material adversity in *White* itself was at least a jury question, given the plaintiff's evidence that the "forklift operator position was objectively considered a better job," whereas the "track laborer duties were by all accounts more arduous and dirtier." *Id.* (cleaned up).

## C

At a higher level of generality, *Brown*, *White*, and the harassment cases simply spell out the contours of a statutory injury requirement, which courts do routinely. For example, the Supreme Court construes statutory causes of action extending to anyone "injured … by reason of" a violation to

---

frame its second holding as a limitation on the first one. Instead, the second holding interpreted the statutory phrase "discriminate against," *see* 548 U.S. at 59–60, 67, which limits the scope of both section 704(a) and section 703(a)(1).

incorporate a background requirement of proximate causation. *See*, *e.g.*, *Holmes v. SIPC*, 503 U.S. 258, 265–70 (1992) (RICO); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529–35 (1983) (Clayton Act). Likewise, although the Clayton Act on its face requires only an injury, the Court unanimously has construed it to require an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334–45 (1990); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–13 (1986). Although the Federal Employers Liability Act provides a cause of action to "any person suffering injury" from the negligence of a railroad while employed by the railroad, the Court has held that emotional harms qualify as an "injury" only if the plaintiff fell within a zone of physical danger. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542–57 (1994). The Administrative Procedure Act provides a cause of action to any person "aggrieved" by agency action—the same word used in Title VII's private right of action—but the Court has held the plaintiff must fall "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The Court has also held that this zone-of-interest requirement "applies to all statutorily created causes of action," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014), including section 706 and its "aggrievement requirement," *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–78 (2011).

Materiality and objectivity requirements, even if not explicitly spelled out in statutory text, are also common. The Supreme Court routinely presumes that anti-fraud statutes require materiality. *Neder v. United States*, 527 U.S. 1, 21–23

(1999); *see Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757 (7th Cir. 2009) ("Materiality is an ordinary element of any federal claim based on a false or misleading statement."). And objectivity requirements follow from materiality requirements, which focus not on the idiosyncratic reactions of an individual plaintiff, but on the likely reactions of a reasonable person. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("[t]he question of materiality, it is universally agreed, is an objective one"). For example, consider the Fair Debt Collection Practices Act, which prohibits making "any false, deceptive, or misleading representation … in connection with the collection of any debt." 15 U.S.C. § 1692e. Despite the statute's double use of the word "any," courts widely agree that a misrepresentation must be material to be actionable, and the materiality standard "is an objective one." *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417–22 (3d Cir. 2015); *see Elyazidi v. SunTrust Bank*, 780 F.3d 227, 234 (4th Cir. 2015).

\* \* \* \*

In sum, *Brown*'s construction of section 703(a)(1) is amply supported by statutory text and numerous lines of Supreme Court precedent. Among other things, *Brown* honors the background maxim of *de minimis non curat lex*; it harmonizes "otherwise to discriminate against" with the other covered adverse actions; it tracks the harassment cases' understanding of "terms, conditions, or privileges of employment"; it tracks *White*'s construction of "discriminate against" as used in section 704(a); and it is consistent with the courts' general interpretive authority to spell out the metes and bounds of express statutory injury requirements. For these reasons, *Brown* was rightly decided.

16

IV

The question presented is not simply whether *Brown* was rightly decided in 1999, but whether it should be overruled more than two decades later. The answer is clearly no.

A

"Overruling precedent is never a small matter." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015). According to the Supreme Court, doing so requires a "'special justification'— over and above the belief 'that the precedent was wrongly decided.'" *Id.* at 455–56 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)). We too have recognized this basic principle of *stare decisis*. *United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc); *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 875–76 (D.C. Cir. 1992) (en banc). The Supreme Court further has stressed that "*stare decisis* carries enhanced force" for decisions interpreting statutes, because "Congress can correct any mistake it sees." *Kimble*, 576 U.S. at 456; *see Halliburton Co.*, 573 U.S. at 274; *Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73 (1989). We too have recognized the same principle, *Burwell*, 690 F.3d at 504; *Critical Mass*, 975 F.2d at 875–76, which applies even more clearly to lower-court decisions correctable by Congress *or* the Supreme Court.

An overwhelming judicial consensus counsels against overruling *Brown*. When that case was decided, the authority for its rule was already "wide and deep." *See Brown*, 199 F.3d at 455–56. Today the authority is vastly wider and deeper. As explained above, we have applied *Brown* in many cases inside and outside the job-transfer context, and our district court has done so in scores if not hundreds more. Outside of this circuit, the courts of appeals now unanimously agree that a plaintiff must show objectively material harm to challenge a job transfer

under section 703(a)(1). *See, e.g.*, *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 61 (1st Cir. 2018) ("We have recognized on several occasions that a transfer may constitute an adverse employment action.… However, not all transfers will suffice."); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (Sotomayor, J.) ("Williams thus must establish that Donnelley's denial of her request for a transfer created a materially significant disadvantage in her working conditions."); *Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 168 (3d Cir. 2017) (plaintiff "failed to demonstrate that the lateral transfer was sufficiently material so as to qualify as adverse for purposes of his *prima facie* case"); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (reassignment is not actionable without "some significant detrimental effect" (cleaned up)); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004) ("under Title VII principles, an employment transfer may qualify as an adverse employment action if the change makes the job objectively worse" (cleaned up)); *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) ("a reassignment without salary or work hour changes" is actionable if accompanied by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation" (cleaned up)); *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) ("To sustain a federal employment discrimination suit, a plaintiff must show something more than the ordinary difficulties associated with a job transfer."); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) ("A transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action."); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000) (failure to respond to grievances "did not materially affect the compensation, terms, conditions, or privileges of the

[plaintiffs'] employment"); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 n.6 (10th Cir. 1998) ("If a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action."); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 n.11 (11th Cir. 2013) ("it's a rare case where a change in employment responsibilities qualifies as an adverse employment action"). Moreover, "hundreds if not thousands of decisions" have stated that an "adverse employment action," which is shorthand for an action with a *material* impact on the terms or conditions of employment, is "essential" to making out a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Threat*, 6 F.4th at 678–79; *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). The sample string-cite set out above could thus easily be expanded to go on for pages. And before today's decision, no contrary authority existed.

Despite this mountain of authority, Congress has expressed no dissatisfaction with *Brown* or its out-of-circuit counterparts. Since 1964, it has amended Title VII on several occasions, including three times to overrule at least ten judicial decisions of which it disapproved. *See* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (overruling *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007)); Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (overruling eight decisions, as described in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 250–51 (1994)); Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076 (overruling *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976)). The fact that "Congress has spurned multiple opportunities" to overrule the *Brown* line of cases cuts against our doing so. *Kimble*, 576 U.S. at 456; *see Watson v. United States*, 552 U.S.

74, 82–83 (2007). To be sure, some justices have raised strong objections to inferring acquiescence based on congressional silence. *See, e.g.*, *Johnson v. Transp. Agency*, 480 U.S. 616, 671–72 (1987) (Scalia, J., dissenting). And one astute commentator has explained that such an inference is more tenuous where lower-court decisions are at issue. Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 331–35 (2005). But if there was ever a case for attributing interpretive significance to congressional silence in the face of lower-court decisions, this is it—with decades-long unanimity, reaching into every circuit and extending over hundreds of cases, in addressing the core provision of one of the most visible statutes in the entire United States Code. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200–01 (1974) ("continued congressional silence" has force where the circuits had interpreted a statute with "almost perfect consistency" for "nearly four decades"). And even attributing no affirmative significance to congressional silence in this case, the breadth and depth of support for *Brown* is itself good reason to proceed with care.

B

My colleagues give three reasons for overruling *Brown* despite all of this. None is persuasive.

1

My colleagues would overrule *Brown* because they view it as "fundamentally flawed." *Ante* at 16. The short answer is that *Brown* is not flawed at all, much less fundamentally so. Yet even if *Brown* were fundamentally flawed, that would hardly be a sufficient ground for overruling it. As noted above, the Supreme Court requires a "special justification" for overruling precedent, apart from its having been wrongly decided. *See, e.g.*, *Kimble*, 576 U.S. at 455–56. Justice

Thomas has forcefully laid out the competing view that precedent should be overruled, without anything more, if it is "demonstrably erroneous." *Gamble v. United States*, 139 S. Ct. 1960, 1981 (2019) (Thomas, J., concurring). But the Supreme Court has not yet accepted this view, and so neither may we.

As mentioned, our cases have also recognized that overruling precedent requires a "special justification" apart from strong disagreement with the merits. *Burwell*, 690 F.3d at 504; *Critical Mass*, 975 F.2d at 875–76. To be sure, these same decisions, together with *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), suggest that precedent may be overruled simply because it is "fundamentally flawed." *See id.* at 18. But *Burwell* and *Critical Mass* both *declined* to overrule precedents. *See* 690 F.3d at 516; 975 F.2d at 875–77. And *Allegheny* overruled a statutory precedent not only because we viewed it as wrongly decided, but also because a later Supreme Court decision contradicted it on the exact question presented—whether an agency should receive deference in interpreting statutes addressed to federal-court jurisdiction. *See* 964 F.3d at 18 (citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50 (1990)). To my knowledge, our only decision overruling circuit precedent based solely on a view that it was wrong is *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1518–25 (D.C. Cir. 1988) (en banc). But the precedent at issue there was only four years old, and it had nothing like the breadth and depth of support for *Brown*. Moreover, *Cumberland Mountains* can hardly be taken as itself a persuasive precedent on precedent, for the Court's analysis contained not a single word about *stare decisis*.

My colleagues view *Brown* as inconsistent with the Supreme Court's increasing emphasis on the primacy of statutory text. *Ante* at 16–17 (citing *Allegheny*, 964 F.3d at 18).

They describe this as a fundamental flaw with *Brown*, whereas *Allegheny* had framed a similar concern as one of inconsistency with intervening precedent. Either way, this methodological criticism of old precedents cannot be enough to justify their overruling. For many past decades, we were not all textualists.[3] Under the "*ancien regime*," the Supreme Court often created private rights of action with little basis in statutory text. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). It often looked to legislative history before statutory text. *See*, *e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n.29 (1971). And it often divined statutory "spirit" to expand or contract statutes beyond their most natural reading, including in a landmark decision interpreting section 703(a)(1) itself. *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 201 (1979) (quoting *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892)). In this "bygone era," this Court likewise followed a "more freewheeling approach to statutory construction." *Wooden v. United States*, 142 S. Ct. 1063, 1085 (2022) (Gorsuch, J., concurring in the judgment) (cleaned up). Many of our cases recognized implied rights of action, *e.g.*, *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419–25 (D.C. Cir. 1992); *Wachovia Bank & Tr. Co., N.A. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 353 (D.C. Cir. 1980); relied mainly on legislative history, *e.g.*, *NRDC, Inc. v. Costle*, 568 F.2d 1369, 1373 (D.C. Cir. 1977); *NRDC, Inc. v. Train*, 510 F.2d 692, 698–702 (D.C. Cir. 1974); or freely consulted statutory "spirit," *e.g.*, *Gen. Serv. Emps. Union Loc. No. 73 v. NLRB*, 578 F.2d 361, 366–67 (D.C. Cir. 1978); *Manoukian v. Tomasian*, 237 F.2d 211, 213–14 (D.C. Cir. 1956). Are all such

---

[3] *Cf.* Harvard Law School, The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes, YouTube at 08:28 (Nov. 25, 2015), https://www.youtube.com/watch?v=dpEtszFT0Tg ("We are all textualists now.").

precedents now to be overruled, either as fundamentally flawed or as inconsistent with the New Textualism? If so, our en banc Court will be very busy indeed.

2

My colleagues next contend that intervening cases have substantially weakened *Brown*. *Ante* at 17. But the passage of time has only made *Brown* stronger. Circuit after circuit has followed its rule. And *White* strongly reinforced *Brown* by construing the phrase "discriminate against" in section 704(a) to incorporate the same objectively material injury requirement that *Brown* held was present in section 703(a)(1).

My colleagues argue that *White* undercut *Brown* in a different way. They reason that *Brown* invoked *Ellerth* as support for requiring section 703(a)(1) plaintiffs to prove *tangible* injury, whereas *White* later described *Ellerth* as requiring such an injury only to identify when an employer is automatically liable for the workplace harassment of a supervisor. *Ante* at 8–9. *Brown* was imprecise in framing a rule requiring "materially adverse consequences" producing an "objectively *tangible* harm," 199 F.3d at 457 (emphasis added), rather than one requiring a harm that is *material* when viewed *objectively*, the key elements that I have discussed and defended above. But this garbling was introduced by *Ellerth*, not *Brown*, and the misleading adjective *tangible* has proven harmless in our *Brown* jurisprudence. Also, none of this undercuts *Brown*'s invocation of *Ellerth*, or *White*'s reinforcement of *Brown*.

To unpack all this, consider the sequence of relevant cases. Before *Ellerth* was decided, there were already legions of cases holding that a plaintiff challenging a job transfer as discriminatory must prove some objectively material harm. *See, e.g.*, *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885

(6th Cir. 1996) ("reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994) (Age Discrimination in Employment Act does not cover "changes in duties or working conditions that cause no materially significant disadvantage to an older employee" (cleaned up)); *Crady v. Liberty Nat'l Bank & Tr. Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities"); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) ("Changes in duties or working conditions that cause no materially significant disadvantage, such as Harlston's reassignment, are insufficient to establish the adverse conduct required to make a prima facie case.").

Next in the sequence came *Ellerth*—which did, as *White* would later explain, address the question of vicarious liability. The Court used *tangible* to describe the harassing acts of a supervisor for which an employer is automatically liable—*i.e.*, those fairly treated as official acts of the employer itself. 524 U.S. at 761–62. In doing so, it described the four cases cited above as illustrating the "concept of a tangible employment action," and then deemed it "prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue." *Id.* at 761. *Ellerth* thus introduced some confusion between "tangible" as a synonym for "material," the standard used in the prior cases to determine the substantive scope of section 703(a)(1) and its analogs in other anti-discrimination statutes, and "tangible" as shorthand for official acts that make an employer automatically liable.

Next came *Brown*. First, it correctly cited the four cases noted above (plus twelve others) for the proposition that "the

authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep." 199 F.3d at 455–56. *Brown* then claimed that *Ellerth* had "reinforced" this authority by invoking it to "announce[] a 'tangible employment action' standard in cases of vicarious liability." *Id.* There was nothing wrong with this reasoning; *Brown* correctly summarized *Ellerth*, and the Supreme Court's extending a line of cases from one context to another *does* tend to reinforce the cases. Finally, *Brown* announced its "rule" that a lateral transfer is actionable only if the employee suffers "materially adverse" consequences producing "objectively tangible" harm. *Id.* at 457. In context, this formulation seems to reflect nothing more than *Ellerth*'s ambiguous use of *tangible.* To be sure, it would have been wrong for *Brown* to announce a categorical rule that only "tangible" harms are actionable under section 703(a)(1), for the hostile-environment cases prove otherwise. But *Brown* announced no such rule. To the contrary, it carefully explained that "[a]fter *Meritor*, plaintiffs could maintain an action even in the absence of a tangible economic effect on employment," if they were subjected to sufficiently severe harassing conduct. *Id.* at 454. The key takeaway is that *Brown*'s reference to "objectively tangible" harm (as opposed to objectively material harm) reflects some muddling from *Ellerth* and has had no distorting effect on *Brown*'s materiality-based jurisprudence.

Last came *White*, which clarified that *Ellerth* had used the concept of a "tangible employment action" only to decide when an employer should be held automatically liable for the harassment of a supervisor, without addressing other questions under section 703(a)(1) or any question under section 704. 548 U.S. at 64–65. The clarification does not undercut *Brown*'s point that *Ellerth*, by extending "wide and deep authority" from the disparate-treatment context to the context of vicarious liability for harassment, tended to strengthen that authority. Nor does it say anything about *White*'s recognition of an

objectively material harm standard for retaliation cases, which affirmatively reinforces *Brown* as explained above.

3

Finally, my colleagues contend that *Brown* has proven unadministrable. Surveying the vast bulk of precedent applying the *Brown* rule, they portray the relevant law as chaotic, and the courts as speaking "with discordant voices." *Ante* at 17.

My colleagues significantly overstate the extent of any conflict. For example, they suggest that the Fifth Circuit stands alone in requiring the plaintiff to prove an "ultimate" employment decision. *Ante* at 17; *see McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (per curiam). But the Fifth Circuit classifies transfers as actionable demotions "if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Alvarado v. Texas Rangers*, 492 F.3d 605, 612–13 (5th Cir. 2007) (cleaned up). In substance, that is the *Brown* rule. My colleagues suggest that two cases from the Seventh Circuit set the injury bar distinctively high. *Ante* at 18; *see EEOC v. AutoZone, Inc.*, 860 F.3d 564 (7th Cir. 2017); *Place v. Abbott Lab'ys*, 215 F.3d 803 (7th Cir. 2000). But the Seventh Circuit recognizes that "adverse actions can come in many shapes and sizes," so transferring an employee to "a more unfriendly working environment" might constitute an actionable injury, depending on the circumstances. *Place*, 215 F.3d at 810 (quoting *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996)). Likewise, my colleagues suggest that *Threat*, which held that a challenged transfer to the night shift was actionable, conflicts with other decisions rejecting challenges to shift transfers. *Ante* at 18–19; *see* 6 F.4th at 679–80. But *Threat* announced no broad rule that all shift-transfer claims are actionable. Instead, it expressly disclaimed any such

"categorical rule," because "[n]ot all shift changes are the same." *Id.* at 679. It is hardly surprising that different courts, applying a qualitative requirement of objectively material injury, have reached different results on different facts in different cases. And even if there were narrow disagreements about whether specific harms qualify as objectively material injuries, that would hardly justify what we do today—create an eleven-to-one split on the anterior, much broader question whether the plaintiff must prove such an injury at all.

The administrability objection suffers from a further problem. An inquiry into whether a transfer caused the plaintiff an objectively material harm is precisely what *White* requires for retaliation claims under section 704(a). If that inquiry can and must be managed, then so too can the same inquiry for disparate-treatment claims under section 703(a)(1). Indeed, some of the cases that my colleagues invoke to show unmanageability involve the *White*-mandated inquiry for actionable injury under section 704(a). *E.g.*, *Forkkio*, 306 F.3d at 1131–32; *Halcomb v. Off. of the Senate Sergeant-at-Arms*, 563 F. Supp. 2d 228, 239, 245–49 (D.D.C. 2008). And in many cases, including this one, the same acts are alleged to be both discriminatory and retaliatory. There is no theoretical or practical reason why we should make the materiality inquiry in one context but not the other.

V

Finally, a few words about the breadth and consequences of today's decision. My colleagues acknowledge that Title VII must not become a "general civility code" for the workplace. *Ante* at 11. To that end, they limit today's decision in some respects: By its terms, the decision applies only to "job transfers" as opposed to other, less significant workplace actions. *Id.* at 20. My colleagues reserve whether the *de*

*minimis* canon narrows the range of actionable injuries under section 703(a)(1). *Id.* at 8. They assure us that the "terms, conditions, or privileges of employment" requirement can be "reasonably construed" to weed out insubstantial claims. *Id.* at 11. And they remind us that the plaintiff still must prove the employer undertook the challenged action for a prohibited reason. *Id.* at 13–14. But the logic of *Brown* extends well beyond transfers, and we currently have no precedent on how to apply the *de minimis* canon here or how to construe the "terms, conditions, or privileges of employment" requirement outside the context of hostile-environment claims. Finally, the requirements for proving discriminatory intent are both modest and unrelated to the question whether any injury is objectively substantial. So today's decision may well be sweeping, and it certainly will be destabilizing.

## A

In focusing on job transfers, the decision has at least superficial appeal. Surely in *most* cases, an unwanted transfer to a new position, or the denial of a wanted transfer, will inflict *some* objectively material harm on an employee. And if so, why not simplify things by dispensing with the need to prove an injury for this category of employment actions?

As with much in this appeal, the simplest answer is *White*. The Court there recognized that cases involving "reassignment of job duties" are very likely, as a group, to create objectively material injuries. *See* 548 U.S. at 70 ("Almost every job category involves some responsibilities and duties that are less desirable than others."). Yet the Court nonetheless held that "reassignment of job duties is not automatically actionable," and so the requisite harm must be proven in "the circumstances of the particular case." *Id.* at 71.

Our own experience with *Brown* highlights the differences among transfer cases. Most job-transfer plaintiffs *have* suffered some objectively material injury and *can* readily prove it. *See*, *e.g.*, *Ortiz-Diaz*, 867 F.3d at 74; *Pardo-Kronemann*, 601 F.3d at 608; *Ginger*, 527 F.3d at 1344. But some plaintiffs have suffered no such harm: one whose transfer simply cut him out of certain meetings and e-mails, *see Forkkio*, 306 F.3d at 1131; another who "went from a position before the [reduction in force] with no duties to a position after the RIF with some duties," *see Currier*, 304 F.3d at 88–89; and a third whose transfer caused only "minor changes in work-related duties or opportunities," *see Stewart*, 275 F.3d at 1135. Other plaintiffs allege, but cannot prove, objectively material harms. For example, Chambers argued that the denial of her requested transfer "resulted in lost awards and career advancement opportunities." 988 F.3d at 501. That would be an actionable injury under *Brown*, but Chambers failed to prove the allegation. *See id.* at 502. Similarly, Chambers argued that the transfer denial forced her to remain in an "unbearable" situation with a "disproportionate" number of cases. *Id.* That might satisfy *Brown* if the workload difference was significant, but Chambers failed to prove that her caseload would be any lower in the unit to which she had sought a transfer. *See id.*

B

Broadening the focus, job transfers are not a distinct category of employment actions, either legally or factually. Legally, section 703(a)(1) covers discriminatory decisions "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual" in the terms or conditions of employment. 42 U.S.C. § 2000e-2(a)(1). So there is no textual basis for categorically distinguishing between transfers and anything else covered by the phrase "or otherwise to discriminate." Nor is there any sharp factual

distinction between transfers and other kinds of decisions affecting an employee's day-to-day work.

My colleagues confine today's decision to cases involving "the transfer of an employee to a new role, unit, or location." *Ante* at 5–6. But this raises its own set of line-drawing challenges. To qualify as such a transfer, does the move have to be permanent? If not, for how long must it last? How much does the job have to change to constitute a "new role"? My colleagues tell us that a transfer from selling sporting goods to selling power tools at the same department store would qualify, *id.* at 13–14, but what about a transfer from selling sports equipment to sportswear? Or from selling hunting rifles to pistols? Or snow skis to snowboards? Must the positions in question be formally different, or is it enough that the employer simply imposes a change of duties within the employee's current job description? If the job description stays the same but the supervisor changes, is that a "new unit"? What if employers broadly define the scope of a position, so that many duties can be part of that job as opposed to a transfer? Rather than creating this artificial distinction between transfers and everything else, it seems simpler to ask more directly the question that matters most—whether the change at issue has materially harmed the employee.[4]

---

[4] My colleagues characterize transfer refusals as the "functional equivalent" of a refusal to hire "for a particular position." *Ante* at 6–7. That is certainly a plausible characterization of many transfer refusals, which is why plaintiffs challenging such refusals have generally cleared the *Brown* hurdle. *See supra* at 4–5. But it does not seem to me a plausible characterization of edge cases like, say, a compelled or refused transfer from selling snow skis to snowboards. As explained above, the analysis of such cases should turn on whether the compelled or denied transfer inflicts an objectively

Moreover, neither the logic of *Brown* itself, nor the logic of today's opinion overruling it, can be limited to the artificial category of job transfers. Simplifying a bit, the core argument for *Brown* is that the statutory phrases "discriminate against," "terms, conditions, or privileges of employment," and "aggrieved" incorporate an objectively material injury requirement. In overruling *Brown*, my colleagues reject that proposition and reserve only the possibility of a *de minimis* exception. None of these interpretive disputes turns on the distinction between job transfers and other kinds of employment actions. So the limitation of today's decision to transfers seems to me illusory on the law, on the facts, and on my colleagues' own reasoning.

## C

If extended beyond the vague category of job transfers, today's decision would be revolutionary. As noted above, we repeatedly have applied *Brown* to screen out cases involving objectively insubstantial injuries alleged to flow from garden-variety workplace assignments and interactions. *See Baird*, 662 F.3d at 1248 (critical comments and shouting); *Douglas*, 559 F.3d at 553 (failure to recommend for award); *Patterson*, 505 F.3d at 1298 (employee subjectively "fe[lt] undermined" (cleaned up)); *Broderick*, 437 F.3d at 1233 (lost opportunity to submit briefs "directly to a top supervisor"); *Taylor*, 350 F.3d at 1292–93 (placement on performance improvement plan); *Russell*, 257 F.3d at 818–19 (poor performance rating). District judges in our circuit have applied *Brown* to do likewise. *See, e.g.*, *Guillen-Perez v. District of Columbia*, 415 F. Supp. 3d 50, 58 (D.D.C. 2019) (scheduling decisions, increased scrutiny, and verbal criticism); *Allen v. Napolitano*, 943 F. Supp. 2d 40, 45–46 (D.D.C. 2013) (conducting meetings without an

material harm on the employee, not on how the employer formally classifies the positions or job duties at issue.

employee); *Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 374 (D.D.C. 2012) (10 days of paid administrative leave and required fitness examination); *Kelly v. Mills*, 677 F. Supp. 2d 206, 221 (D.D.C. 2010) (supervisor's failure to speak Spanish, leave handwritten notes, or invite employee into his office); *Halcomb*, 563 F. Supp. 2d at 241 (low performance ratings and increased supervision); *Hunter v. Rice*, 480 F. Supp. 2d 125, 132–33 (D.D.C. 2007) (refusing to increase signing authority for grants); *Edwards v. EPA*, 456 F. Supp. 2d 72, 85 (D.D.C. 2006) (denial of single training or travel opportunity); *Rhodes v. Chertoff*, Civ. A. No. 04-1715, 2005 WL 3273566, at *6 (D.D.C. Aug. 4, 2005) (oral counseling for poor performance); *Moncrief v. Daro Realty, Inc.*, Civ. A. No. 03-762, 2005 WL 1119794, at *11 (D.D.C. Apr. 28, 2005) (failure to provide company cell phone); *Dobbs v. Roche*, 329 F. Supp. 2d 33, 42 (D.D.C. 2004) (change in duties over three-month transition period); *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001) (uneven workload distribution). At oral argument, we discussed hypotheticals involving everything from coffee duty to the assignment of offices with windows. These are just some of the ordinary workplace snubs that *Brown* and *White* would screen out as "petty slights or minor annoyances that often take place at work and that all employees experience." *White*, 548 U.S. at 68. Yet now, they all may support litigation under Title VII and various similarly worded statutes such as the ADEA and the Americans with Disabilities Act. *See Brown*, 199 F.3d at 456 n.10.[5] Even with *Brown* in

---

[5] My colleagues invoke the very different hypothetical of an employer hosting a weekly doughnut day and hanging a "whites only" sign over the doughnuts. *Ante* at 13. Although evocative, this one is unrelated to any case decided under *Brown*. And for good reason: Such an employer would violate section 703(a)(1), which prohibits "the practice of creating a working environment heavily

place, employees annually file more than 60,000 charges with the EEOC and more than 10,000 discrimination cases in court. *U.S. District Courts—Civil Cases Commenced, by Basis of Jurisdiction and Nature of Suit*, U.S. Courts (Dec. 31, 2021); EEOC, Charge Statistics FY 1997 Through FY 2021. Without a meaningful injury requirement, who knows how much those numbers will increase?

The requirement to prove discriminatory intent will not solve this problem. Bad intent is easy to allege, and intent is much harder to assess early on than is the question whether an alleged injury is *objectively* material. Consider the familiar doctrines governing proof of intent. At the pleading stage, a Title VII plaintiff need not even allege a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). On a motion to dismiss, the court must accept the truth of all factual allegations, and the inference of bad intent need only be "plausible"—a modest standard falling well short of more likely than not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). After the motion-to-dismiss stage, the burden-shifting framework of *McDonnell Douglas* complicates things even more. Under that framework, the "burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And once an employee carries this burden, the employer will lose the case—as a matter of law—unless it can produce evidence of a "legitimate, nondiscriminatory reason" for its action. *Id.* at 254. This framework is sensible enough for assessing the intent behind significant actions such as hiring or firing, which employers can reasonably be expected to document with care. But for claims that *Brown* would have screened out as immaterial, this is highly unrealistic. Must an

charged with ethnic or racial discrimination." *Meritor*, 477 U.S. at 66 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).

employer really document the reasons for every workplace interaction from temporary assignments to scheduling decisions? How can an employer possibly reconstruct, in litigation months if not years after the fact, the "legitimate, nondiscriminatory reason" for any such miniscule decision? And because intent is often hard to prove or disprove, a frustrated employee might as well take his chances in litigation. A screen for *objectively* insubstantial injury is thus necessary to keep Title VII claims within manageable limits.

To close the floodgates, my colleagues stress that not all workplace interactions involve terms, conditions, or privileges of employment, and they dangle the possibility that *de minimis* injuries may not be actionable in any event. But precisely because we have screened out objectively insubstantial claims under *Brown* for more than two decades, we have not had occasion to build up, in this context, a jurisprudence directly resting on *de minimis non curat lex*. Likewise, our extant caselaw has imposed limits on what counts as terms, conditions, or privileges of employment only in the specific context of hostile-environment claims. So what happens next, as courts in non-transfer cases are confronted with claims that *Brown* would have screened out for lack of an objectively material injury? Instead of saying "the injury is not actionable under *Brown*," may a judge instead simply say "the injury is *de minimis* under *Wisconsin v. Wrigley*" or "the injury is not substantial enough to affect a condition of employment"? Automatically exporting *Brown* standards to either context would seem in tension with the spirit if not the letter of today's opinion, which does not confirm even the existence of a *de minimis* exception. But preventing the export of *Brown* standards to either context would negate my colleagues' promise of manageable limits. And leaving everything to be decided afresh, under a new *de minimis* jurisprudence or a new, non-harassment terms-and-conditions jurisprudence, would

eliminate two decades of judicial experience in distinguishing substantial harms from insubstantial ones.

Why create this degree of uncertainty? My colleagues worry that *Brown* has screened out too much. Yet as shown above, it has screened out relatively few claims arising from clear job transfers as opposed to lesser kinds of employment actions. Perhaps, as my colleagues assert, some job-transfer cases have applied *Brown* too stringently. *Ante* at 8. But any such cases are the exception, not the rule. Rather than jettisoning two decades of our Title VII jurisprudence and starting over from scratch, I would have simply reminded the courts that the requirement of an objectively material injury, although important, is not especially onerous.

## VI

The Court badly errs in overruling *Brown*, and so I respectfully dissent.